UNIVERSAL SHIPPING, INC.,
Plaintiff, Appellee,

v.

The PANAMANIAN FLAG BARGE, etc.,
Defendant in Rem, Appellee,

Caparra Stevedoring & Maritime
Agencies, Inc., Intervening
Plaintiff, Appellee,

Industrial Fibers Corp. and the Puerto
Rico Ports Authority, Intervening
Plaintiffs, Appellants.

No. 75–1306.

United States Court of Appeals,
First Circuit.

Feb. 8, 1977.

Jose Antonio Fuste, San Juan, P.R., with whom Herbert W. Brown, III, San Juan, P.R., and Jimenez & Fuste, San Juan, P.R., were on brief for appellants.

Francisco G. Bruno Rovira, Hato Rey, P.R., with whom Hartzell, Ydrach, Mellado, Santiago, Perez & Novas, Hato Rey, P.R., were on brief for the Panamanian Flag Barge, etc., appellee.

Alex Gonzalez, San Juan, P.R., with whom Gonzalez & Rodriguez, San Juan, P.R., was on brief for Caparra Stevedoring & Maritime Agencies, Inc., appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Appellants, the Puerto Rico Ports Authority (Ports Authority) and Industrial Fibers Corporation (Industrial Fibers) each intervened in an in rem action against the Panamanian flag barge known as BARGE H–1 (Barge). The Ports Authority sought to recover various harbor fees from the Barge, and Industrial Fibers attempted to recover the damage to certain cargo it had caused to be placed on board the Barge, but which had never been shipped. The district court rejected each claim, and each party now appeals.

Although appellants' claims are distinct, an understanding of each requires the recitation of the facts surrounding the last voyage of the Barge with the tug "PURE GOLD" (Pure Gold). The Barge is an unmanned, engineless vessel which must be pulled by a tugboat. On March 21, 1974, the Barge, then being pulled by Pure Gold, departed from the Port of Rio Haina, Dominican Republic, allegedly bound for the Port of Spain, Trinidad. Neither the Barge nor the tug had any cargo aboard, the record being silent as to the purpose of this long, cargoless voyage. On March 24, after the vessels had been at sea for several days, the tug's engines developed serious mechanical problems, and the vessels' charterer directed the captain to take the Pure Gold and the Barge to the nearest port where repairs could be had—which was San Juan, Puerto Rico. After the vessels arrived in San Juan on March 26, some efforts were made to have the tug engine repaired, but, inexplicably, the repairs were not completed by November 22, 1974, the date upon which the tug and the Barge were arrested and the present proceedings instituted.

The record reflects that, almost immediately after the Barge arrived in San Juan on March 26, its charterer, through a local agent, began looking for cargo which the Barge could carry. By March 29, its charterer had entered into an agreement in which the Barge, now apparently to be towed by a different tug, would carry a shipment of 1,923 bales of waste paper to Venezuela. The waste paper was being sold, FAS, to Compania Anonima Vensolana de Pulpa y Papel (Venepal), by appellant, Industrial Fibers.

The apparent understanding of the parties to the carriage contract was that the Barge would embark for Venezuela shortly after the loading of the paper and the issuance of the bill of lading, both of which events had occurred by April 9. For reasons which are not explained, the Barge did not leave San Juan before its arrest on November 22. During the intervening period, the paper on board the vessel deteriorated to an unspecified extent. Prior to November 22, Industrial Fibers was able to persuade Venepal to extend the shipment date several times, the last extension permitting shipment by late October or early November, 1974. A term of the last extension appears to have been that Venepal would pay for only that portion of the paper which was usable.

The subsequent events need only be summarized briefly since they do not directly bear upon the issues in this appeal. After both the Pure Gold and the Barge were arrested, motions were made to sell both vessels. The sale of the tug was authorized, but before it could be effected, the tug sank. It is for this reason that the parties to this appeal have abandoned any claims they might have against the Pure Gold. Thereafter, the Barge was sold by the court for $58,000. The present appeals are attempts to establish claims in the fund generated by the sale of the Barge.

## I. THE PORTS AUTHORITY'S CLAIM

The Ports Authority seeks to collect the harbor fees which must be paid by all vessels that are not made exempt by statute. *See* 23 LPR §§ 2505–06. Below, the district court held that the Barge was exempt from

the fees by reason of 23 LPR § 2507(b)(6), which creates an exemption for vessels which enter the harbor "exclusively for making indispensable repairs in order to continue [their] voyage." The district court believed the determinative consideration under the statute was the motivation of the vessels' charterer at the instant the Barge entered the port. Notwithstanding the fact that the charterer utilized the stop in San Juan to take on cargo and prepare to embark on a wholly different voyage, the court found that the exclusive motivation for the stop was to obtain repairs for the tug. It reasoned that, when the charterer directed the vessels to proceed to San Juan, it "did not have in mind a specific possibility, not to mention probability, of a definite cargo. The object of sending the vessels into San Juan was not to receive business, which was purely speculative, but at once to get the vessels out of a situation of distress and danger." The Ports Authority attacks this finding as clearly erroneous, reasoning primarily that the actions of the vessels' charterer after the Barge arrived in San Juan are inconsistent with the district court's finding. We need not address this issue because we are persuaded that the district court applied an inappropriate legal standard and that the application of the correct standard requires the conclusion that the Barge was liable for the fees.

■ Although the Puerto Rico Supreme Court has had no occasion to construe § 2507(b)(6), it has declared that tax exemptions, and hence fee exemptions, are to be narrowly construed.

"Since tax exemptions are derogations of the power of a state, they must not extend beyond the express and exact terms of the statute granting them and every doubt must be resolved against exemptions from taxation, . . . except when a contrary construction is justified for the purpose of implementing the legislative purpose." *Esso Standard Oil Co. v. The Puerto Rico Ports Authority,* 95 P.R.R. 754, 766 (1968). [Citations omitted.]

Following, as we must, the command of the Puerto Rico Supreme Court, our task is to determine the narrowest possible interpretation of the statute consistent with the implementation of the legislative purpose.

Puerto Rico's system of collecting fees for the use of its harbor facilities and for the services it supplies is, of course, a means of collecting revenue to pay the costs of maintaining the Puerto Rico ports. The scheme as a whole reflects a legislative judgment that the costs of the harbor maintenance and services should be borne by those vessels which are engaged in trade in the harbor and which are there to benefit economically.[1] Section 2507(b)(6)'s "exclusively for making indispensable repairs" language, taken in the context of the scheme as a whole, strongly suggests that the purpose of the distress exemption is to create an exception for those vessels which enter the port because of circumstances beyond their control and which neither attempt to gain nor in fact derive economic benefits from the unplanned stopover in Puerto Rico.[2]

■ This discussion suggests that a vessel which adds any cargo while in port—

---

1. It appears that all vessels which are engaged in trade in Puerto Rico are required, in some manner, to reimburse the Ports Authority for the costs of maintaining the harbor and of providing harbor services. Although vessels engaged in local trade and commerce are exempt from the fees requirement *see* § 2507(b)(1), (2), (3), & (4), these vessels pay annual license fees. *See* § 2511. The only blanket exemptions are for some government vessels that are not engaged in maritime trade, *see* § 2507(a), for ships in distress, and for ships "entering port exclusively for taking the necessary water, provisions, or fuel in order to continue [their] voyage." § 2507(b)(5). There

is also, in the discretion of the Director, an exemption for vessels entering the port to provide disaster relief. *See* § 2507(c). While this exemption may benefit vessels which are engaged in trade for profit, the discretionary nature of this exemption and the special circumstances which give rise to it do not call into question our observation regarding the legislative judgment as to which vessels should pay the costs of harbor maintenance.

2. The distress exemption and § 2507(b)(5). *see* n. 1, *supra,* seem to complement each other and create this rule.

however small the amount—should forfeit its entitlement to the distress exemption. We are cognizant of the Barge's argument that a vessel which enters the harbor while under distress should be permitted to add cargo—presumably in small amounts—in order to minimize the losses which inevitably arise from the need for repairs. But we need not decide whether a vessel that entered the harbor in distress, took on a small amount of cargo and then continued its voyage should lose its entitlement to the exemption. Here the Barge not only took on cargo; it also changed its destination from Trinidad to Venezuela. The statute provides that the stopover must be "exclusively for making indispensable repairs *in order to continue [the] voyage.*" [Emphasis supplied.] Whether or not the addition of cargo per se removes a vessel from § 2507(b)(6), the emphasized language, considered in the context of the scheme as a whole, indicates that the exemption must be denied a vessel which changes its destination because it was able to take on such large amounts of cargo that the change in the voyage plans were profitable for it. For purposes of this statutory scheme, such a vessel cannot rationally be distinguished from those which are in the port primarily to engage in trade, and it cannot qualify for the exemption.

It is implicit in the foregoing that in determining the applicability of the distress exemption, a critical component of the inquiry should be upon the objective conduct of the vessel while in the port. The problems with a construction which focuses solely upon the subjective motivation of the vessel at the time it entered the port are twofold. First, it permits circumvention of the apparent legislative judgment as to the vessels which should pay the cost of harbor services. The district court's approach plainly permits a vessel to sail into the port,

cargoless and allegedly in need of repairs, to enter into a lucrative contract to carry cargo to an entirely different port and—after having the repairs performed—to sail off without reimbursing the Ports Authority for the benefits the vessel received while in the harbor. We are satisfied the Puerto Rico legislature intended to treat such vessels the same as those which enter the port with the purpose of conducting cargo business. Secondly, the district court's construction could present enormous administrative problems for the Ports Authority. The case at bar illustrates how difficult it can be to establish that a vessel in need of repairs entered the harbor partly to take on cargo. Without suggesting that the district court's factual finding was erroneous, we observe that it is entirely conceivable that vessels could enter the port under these circumstances while contemplating the addition of cargo. It invariably would be difficult for the Ports Authority to establish that repairing the vessel was not the exclusive motivation for the stopover.[3]

Applying an objective legal standard to the facts of this case is a simple matter. Since the Barge, while allegedly bound for Trinidad, took on cargo to be carried to Venezuela after it docked in San Juan, it is not entitled to the benefits of the distress exemption.[4] The judgment of the district court is reversed, and the case is remanded for a determination of the amount of the fees that are owing and for the entry of judgment for the Ports Authority.

## II. INDUSTRIAL FIBERS' CLAIM

Industrial Fibers' claim against the Barge arises from an alleged breach of the carriage contract. Although title to the wastepaper passed to Venepal when the cargo was loaded on the Barge, Industrial

---

**3.** The significance of these problems would be magnified several times, if, as we would expect to be the case, § 2507(b)(5), *see* note 1 *supra,* and § 2507(b)(6) were construed *in pari materia.*

**4.** The fact that the Barge never left the port with the cargo on board cannot be relevant.

Quite apart from the fact that the statute is not written in terms which could permit consideration of this factor, we note that, were it a relevant consideration, the Ports Authority would not know whether fees were owed until after the vessel left the port—when it would be too late to collect.

Fibers was assigned Venepal's rights in the cargo and thus is a proper party to pursue this claim. In the district court, Industrial Fibers proceeded on the theory that the wastepaper, while in the possession of the Barge, was damaged to the point it was worthless as paper, and it attempted to recover some $109,000, which is alleged to be the value of the paper if it had not been damaged. To prove that the wastepaper had become a total loss, Industrial Fibers introduced the testimony of two witnesses and then rested. After considering the testimony, the district court concluded that the evidence did not establish the alleged damages to the paper, and it entered judgment for the Barge. We have carefully reviewed the testimony and find no error was committed below.

There is omitted from publication, as of no interest except to the parties, an analysis of the evidence Industrial Fibers presented.

*The judgment denying relief to Industrial Fibers is affirmed. The judgment denying relief to the Puerto Rico Ports Authority is reversed and the case is remanded for proceedings consistent with this opinion. No costs.*

